**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:09cv471**

| | |
|---|---|
| **TAMMY A. SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 7] and the Defendant's Motion for Judgment on the

Pleadings [Doc. 13].

**I.    PROCEDURAL HISTORY**

The Plaintiff Tammy Smith protectively filed an application for a period

of disability and disability insurance benefits, and for Supplemental Security

Income benefits, on October 31, 2005, alleging that she had become disabled

due to degenerative disc disease, hip and back problems, anxiety and

depression, asthma, and fibromyalgia as of August 27, 2005. [Transcript

("T.") 84-86, 94].   The Plaintiff's application was denied initially and on

reconsideration. [T. 60-63, 55-58].  A hearing was held before Administrative

Law Judge ("ALJ") Gregory Wilson on December 17, 2008. [T. 400-48]. On April 7, 2009, the ALJ issued a decision denying the Plaintiff benefits. [T. 13-29]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 6-8]. The Plaintiff has exhausted her available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  20 C.F.R. §§ 404.1520, 416.920.  If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant.  20 C.F.R. §§ 404.1520, 416.920.  Second, the claimant must show a severe impairment.  If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation

4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV. FACTUAL BACKGROUND

Plaintiff was 39 years old at the time of the ALJ hearing. [T. 427]. She completed the ninth grade. [T. 117]. She last worked in August 2005 as a certified nursing assistant (CNA) in a nursing facility, where her primary duties included changing, feeding, and bathing residents. [T. 428].

### A. Evidence of Physical Limitations

Plaintiff received treatment from her primary care physician, Brian McDowell, M.D. between August 2001 and November 2008 for a variety of ailments, including headaches, right otitis media, bronchitis, sinusitis, anxiety, depression, lower back pain, and urinary tract infections. [T. 297-317]. On July 15, 2005, he noted tenderness to palpation over the low cervical spine

and paracervical region bilaterally, as well as trigger point tenderness in the upper and lower back. Plaintiff's sciatic notches were nontender, and did not experience pain during a straight leg raise (Lasegue) test (i.e. negative straight leg raising). It was noted that Plaintiff's anxiety was reasonably controlled. Dr. McDowell diagnosed Plaintiff with fibromyalgia and prescribed medication. [T. 309].

On July 28, 2005, Plaintiff presented to the Mission Hospital Emergency Department, complaining of right hip and groin pain that started two nights earlier. She denied any back pain. It was noted that she was otherwise very healthy. X-rays of the right hip and pelvis were normal. Upon examination, it was noted that she had good active and passive range of motion in the hips, and that she had no tenderness in the leg. She was diagnosed with a probable strain, prescribed Vicodin, and referred to an orthopedist. [T. 219-24].

In September 2005, the Plaintiff underwent a hysterectomy. [T. 148-201]. Thereafter, on October 17, 2005, the Plaintiff returned to the Mission Hospital Emergency Department, where she reported having constant low back pain, occasionally radiating into her lower extremities, which had been occurring for the prior few years. She reported that the pain had worsened after a recent surgery. She denied any recent strain or trauma. She reported

that Vicodin did not improve her symptoms.  She denied any weakness or paresthesia.  A physical examination revealed full range of motion of her extremities.  She was diagnosed with a lumber strain and encourage to continue her current medications, including ibuprofen.  [T. 204-14].

On October 19, 2005, Plaintiff was examined by orthopedist Michael Goebel, M.D.  She reported having low back pain for the prior couple of years which had worsened since her hysterectomy and which was exacerbated by any standing or walking.  Dr. Goebel observed a leg length inequality, which he confirmed through x-rays of the lumbar spine.  These x-rays otherwise showed no abnormalities.  A physical examination revealed a normal stance and gait, with full range of motion in the knees and hips.  Plaintiff's motor strength was five on a five point scale throughout.  Dr. Goebel diagnosed Plaintiff with a lower extremity leg length inequality and fitted her with a shoe lift to alleviate her discomfort.  [T. 202-03].

Plaintiff was seen by Richard Jones, M.D. of Southeastern Sports Medicine on October 27, 2005.  She complained of back pain since her hysterectomy in September 2005, stating that this was a "new injury" and that she had "never had this problem before."  She reported numbness and tingling going down her right leg.  Examination showed some mild tenderness in the right sacroiliac joint area and over the greater trochanteric bursa.  There

was no deformity or tenderness in the lumbar spine, lower lumbar, buttock area or hips. Dr. Jones noted that Plaintiff had full range of motion of the lumbar spine, and straight leg raising was negative. X-rays of the lumbar spine showed no abnormalities. Dr. Jones diagnosed Plaintiff with lumbar strain and greater trochanteric bursitis, which he treated with an injection. He further prescribed physical therapy and Celebrex. [T. 225-26].

Plaintiff returned to see Dr. McDowell on December 12, 2005. At that time, he noted that her fibromyalgia was improved. Dr. McDowell noted tenderness over the right sacroiliac region and symmetrical upper and lower trigger points, but which was "decreased from before." It was noted that she had full range of motion in her extremities. Dr. McDowell diagnosed her with osteoarthritis of the lumbar spine and prescribed a three-pronged to cane to use as needed for ambulation. [T. 307].

A Physical Residual Functional Capacity (RFC) Assessment performed on January 6, 2006 for Disability Determination Services (DDS) found Plaintiff capable of medium exertion. [T. 239-46]. This assessment was affirmed on February 22, 2006. [T. 265]. A second Physical RFC Assessment performed on February 24, 2006 found Plaintiff to be capable of light work with certain postural limitations. [T. 266-73].

On April 1, 2006, the Plaintiff presented to the Mission Hospital Emergency Department, complaining of chest pain, pain radiating down her left arm, and shortness of breath. She further reported a history of chronic pain, primarily in her back, as well as a history of coronary artery disease, fibromyalgia, hyperlipidemia, endometriosis, degenerative joint disease, anxiety and depression. Examination of all areas was normal. She was given IV nitroglycerin and morphine, which resolved her pain. A myocardial infarction was ruled out after a cardiac consultation. She was diagnosed with pneumonia and was discharged. [T. 274-88].

In August 2006, Dr. McDowell diagnosed Plaintiff with anxiety and recommended that she follow-up at Skyland Behavioral Health Services. [T. 303]. On March 15, 2007, he diagnosed her with degenerative disc disease of the lumbar spine. [T. 300].

Neurologist Michael Young, M.D. examined Plaintiff on June 20, 2007. At that time, she reported widespread pain from fibromyalgia, which she stated that she "had had forever." She further reported a history of degenerative disc disease, migraine headaches, asthma and bronchitis, bipolar disorder, decreased vision in her left eye, and tinnitus and hearing loss. A motor examination was normal, with full strength in the upper and lower extremities. Some pressure points were noted in the proximal/distal

upper and lower extremities. Dr. Young diagnosed Plaintiff with "presumed chronic fibromyalgic pain disorder" and recommended that she see a rheumatologist. [T. 294-96].

Dr. McDowell referred Plaintiff to rheumatologist William Gough, M.D. in July 2008. Dr. Gough noted that Plaintiff was oriented times four, with appropriate judgment, insight, mood, and affect. A physical examination at that time was normal, except for some mild tenderness and swelling in several joints in the left hand and mild tenderness in the left wrist and right hand. Dr. Gough further noted mild tenderness in Plaintiff's left shoulder, hips, and left knee. He noted full range of motion and strength in all areas. A myofascial examination showed that Plaintiff experienced pain at all eighteen standard tender points for such exam. He diagnosed her with fibromyalgia, increased her Lyrica dosage, and recommended further diagnostic testing. Subsequent testing was normal and showed no evidence of disc degeneration or herniation, spinal stenosis, neoplasm or fracture. After review of these diagnostic tests, Dr. Gough concluded that her major problem was myofascial pain and returned her to Dr. McDowell's care. [T. 330-43].

Dr. McDowell provided an opinion regarding Plaintiff's residual functional capacity on November 17, 2008. The conditions upon which he based his findings were fibromyalgia with chronic pain and chronic trigger point

tenderness in her back and lower legs, chronic depression/anxiety, and chronic fatigue. He noted that chronic depression and anxiety exacerbated her fibromyalgia pain, and that chronic shortness or breath attendant to chronic bronchitis limited her. He further noted that her medications caused sedation. Dr. McDowell opined that Plaintiff's symptoms limited her attention, severely limited her ability to deal with work stress, and would cause her to miss more than three days of work per month. He further opined that Plaintiff could walk 50 feet without rest, could sit for 30 minutes, could stand for ten minutes, needed rests and unscheduled breaks, and was limited in repetitive use of her hands. [T. 349-51].

## B.    Evidence of Mental Limitations

On January 6, 2006, Jerelene Howell, M.S. performed a psychological evaluation of the Plaintiff for DDS under the direction of William Dycus, Ph.D. Plaintiff reported having been in special education classes and quitting school after eighth grade due to pregnancy. She reported suffering from degenerative disc disorder, asthma, and fibromyalgia syndrome. Plaintiff reported being capable of interacting well with co-workers and supervisors "for the most part." Plaintiff's test scores on the WAIS-III were a full scale IQ of 60, a verbal IQ of 65, and a performance of 60. Based on these test results, Ms. Howell concluded that Plaintiff is functioning within the extremely low or

mild mental retardation range of intellectual abilities. Ms. Howell found the testing results to be valid, as the testing environment was good and the results were consistent with Plaintiff's history of special education. She further opined that it appeared that Plaintiff put forth her best effort. Ms. Howell diagnosed Plaintiff with major depressive disorder, recurrent, moderate without psychotic features; panic disorder with agoraphobia; nicotine dependence; mild mental retardation; and a Global Assessment of Functioning (GAF) score of 43. She found that Plaintiff was able to understand, retain and follow simple instructions and was minimally able to perform simple mental calculations. Psychologically, it was noted that Plaintiff presented with a rather flat affect and depressed mood. Noting Plaintiff's work history, Ms. Howell opined that it was "quite remarkable that she was as successful as she reported due to low IQ functioning." She opined that Plaintiff clearly would have difficulty in physically demanding work environments that require a fast pace and problem solving, and that she would need supervision in appropriately managing any disability benefits that she may receive. [T. 234-38].

A Psychiatric Review Technique (PRT) was performed by Wilbur Albertson[1] on January 12, 2006. He reviewed Ms. Howell's evaluation and

---

[1]The record does not indicate Mr. Albertson's credentials.

11

concluded that Plaintiff was capable of performing simple, routine repetitive tasks and that her adaptive functioning suggested "BIF [borderline intellectual functioning] level intelligence." [T. 247-60]. Mr. Albertson then performed a Mental RFC Assessment, in which he concluded that Plaintiff was capable of performing simple, routine repetitive tasks in a low stress, low production environment with limited interpersonal demands. [T. 261-64].

Records from Skyland Behavioral Health Services indicate that Plaintiff first began mental health treatment in 2006. [T. 289-93]. In September 2006, she was seen by Patrick Lillard, M.D. At that time, she reported continuing problems with anger, paranoia, and hearing voices. He diagnosed her with "psychosis, rule out psychotic depression vs. bipolar with psychotic feature," low intellectual functioning, and possible anxiety. He recommended continued therapy and prescribed medication. [T. 293].

Plaintiff returned to Dr. Lillard in November 2006. At that time, he noted that her psychotic process continued, but that she was no longer hearing voices. [T. 290]. On January 18, 2007, Michael Grant, Ph.D. examined Plaintiff and diagnosed her with severe depression, but concluded that she was not a good candidate for therapy. He referred her to a local chronic pain management practice. Records indicate that she failed to attend her next appointment. [T. 289]. Plaintiff returned to Skyland Behavioral in October

2008, when she was seen by Roger deBeus, Ph.D. Dr. deBeus diagnosed Plaintiff with severe depression, but ruled out post traumatic stress disorder and chronic pain. [T. 347]. On October 24, 2008, Dr. deBeus observed her mood and affect to be "relatively flat, mildly angry, somewhat resistant." [T. 348]. On November 7, 2008, he noted that she was "somewhat engaged" with good effort. On November 14, 2008, however, when Plaintiff brought him disability paperwork to complete, he observed that she was "very engaged" and she reported having been placed on three new medications by her physician. [Id.].

On November 18, 2008, Karen Marcus, Psy.D., performed a psychological evaluation of Plaintiff. [T. 352-66]. She performed a battery of tests on Plaintiff, including IQ testing. Results of the cognitive testing performed indicated that Plaintiff's IQ was in the extremely low range, consistent with her WAIS-III scores from 2006. Dr. Marcus noted that there were several inconsistencies in Plaintiff's reports, but opined that this was "not surprising" in light of Plaintiff's various symptoms. Dr. Marcus rejected the notion that Plaintiff was malingering, noting that "[t]he consistency of her inconsistencies and the presence of such varied mental health symptoms over time could not be contrived ...." [T. 364].

One of the tests administered by Dr. Marcus was the Test of Memory

Malingering (TOMM), a recognition test designed to assist with determining memory dysfunction. Out of three trials, Plaintiff scored 34, 41, and 44, respectively. Dr. Marcus noted that Plaintiff's initial scores "were somewhat lower than what would be desired" but appeared to be "consistent with her reported history." In light of her improved scores over the three trials, Dr. Marcus determined that Plaintiff "was putting forth an appropriate level of effort for the testing." [T. 360-61].

In conclusion, Dr. Marcus opined that Plaintiff had "significant fluctuations in attention/concentration" and "significant difficulties getting along with others." [T. 365]. Dr. Marcus diagnosed Plaintiff with bipolar disorder, post-traumatic stress disorder, a learning disorder, borderline intellectual disorder, personality disorder,[2] and a GAF of 45. [Id.]. Dr. Marcus also completed a PRT form, indicating that Plaintiff meets Listings 12.04, 12.05, 12.06, and 12.08; that she has marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that she has had three episodes of decompensation, each of an extended duration. [T. 367-80].

On December 12, 2008, Dr. deBeus evaluated the Plaintiff through a

---

[2] The bipolar disorder, learning disorder and personality disorder were identified in the diagnosis as "NOS" (not otherwise specified).

Medical Source Assessment (Mental).  His assessment, however, was only with regard to the four factors set out in subpart B of Listing 12.04 (the "B" Criteria), wherein he found extreme limitations in social functioning, marked limitations in concentration, persistence or pace, moderate limitations in activities of daily living, and no episodes of decompensation.  [T. 381-84].

### C.    Testimony at the ALJ Hearing

Plaintiff's hearing before the ALJ began with Alfred Jonas, M.D. testified via telephone as a medical expert in psychiatry.  At the outset, Dr. Jonas indicated that he had not been provided with certain record exhibits, including Dr. Marcus's psychological evaluation.  [T. 406].  While it appears that Dr. Marcus's evaluation was faxed to him during the course of the hearing, Dr. Jonas only had the opportunity to skim the evaluation during his testimony [see T. 416].

With respect to the TOMM testing administered by Dr. Marcus, Dr. Jonas testified that the lowest acceptable score is considered to be 45, and that scores below 45 generally indicate intentionally suppressed performance. [T. 411].  Regarding activities of daily living, Dr. Jonas opined based on his review of the record that Plaintiff's activities of daily living were mildly impaired; that she had a marked impairment in social functioning; and that she had a mild to moderate impairment in concentration, persistence, and pace.

[T. 421].  Dr. Jonas stated that he could not provide an opinion about decompensation based on the evidence before him.   [T. 421-22].

Dr. Jonas stated that it appeared to him that Dr. Marcus was struggling to reconcile Plaintiff's inconsistent test results without finding her to be malingering.  [T. 417-18].  Dr. Jonas stated that he found no support in the record for Dr. Marcus's diagnoses of bipolar disorder and post-traumatic stress disorder.  [T. 418].  He further indicated that Plaintiff's IQ scores did not appear to be consistent with the higher level of actual functioning that the Plaintiff had demonstrated. [T. 419].

Plaintiff also testified at the ALJ hearing.  She stated that she is able to add and subtract but cannot multiply or divide.  [T. 427].  She testified that she hurts all of the time, especially in cold weather.  She uses a cane regularly. She reported that her fingers and hands are swollen and cramp all the time. [T. 432].  Plaintiff reported having difficulty dealing with people.  In school, she stated that she could not get along with others.  She admitted being mean to people and not wanting people to be around her.   She admitted picking arguments to get people to leave her alone. She reported that she was able to deal with nursing home patients because they were bed-bound.  [T. 433].

Plaintiff stated that her memory was not good.  She reported being easily distracted and not being able to recall things that she read.  [T. 434].

She does not read newspapers or the mail. [T. 437-38]. She stated that she often would have her friends and co-workers fill out paperwork for her because she could not understand it. [T. 433]. Plaintiff reported that she could lift only up to ten pounds due to pain. She stated that she only gets about four hours of sleep per night due to anxiety. [T. 435].

With respect to activities of daily living, Plaintiff reported that she sometimes cooks, does laundry, sweeps, and mops. She does not vacuum or clean the bathroom. She reported having one friend who visited her regularly and helped her clean the house. [T. 440]. Plaintiff does not belong to any clubs or groups. Her only hobby is scrapbooking. She denied going out with her boyfriend often, stating that she often picks fights with him. [T. 441].

A vocational expert (VE) also testified at the ALJ hearing. In response to the ALJ's hypothetical questions, the VE testified that a person of Plaintiff's age, education, relevant work experience and residual functional capacity could not perform Plaintiff's past relevant work as a CNA but could do light unskilled jobs such as garment sorter, silverware wrapper, and electrical equipment inspector. [T. 443-44].

## V.    THE ALJ'S DECISION

On April 7, 2009, the ALJ issued a decision denying the Plaintiff's claim. [T. 13-29].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured was December 31, 2009 and that she had not engaged in any substantial gainful activity since August 27, 2005.  [T. 15]. The ALJ then determined the following was a combination of severe impairments: fibromyalgia, occasional bronchitis, anxiety, depression, borderline intellectual functioning, and a personality disorder.  [T. 15].   The ALJ concluded that her impairments did not meet or equal a listing.  [T. 15]. He then determined that Plaintiff retained the residual functional capacity to perform the full range of light work. [T. 24].  He found that Plaintiff was a younger individual with a limited (ninth grade) education who was unable to perform her past relevant work.  [T. 28].  At step five, the ALJ obtained medical and vocational expert testimony and concluded that significant work existed in the national economy that Plaintiff could perform.   [T. 28]. Accordingly, he concluded that the Plaintiff was not disabled since August 27, 2005.  [T. 29].

In evaluating the severity of Plaintiff's mental impairment and functional capacity, the ALJ "relied heavily" on the testimony and opinion of Dr. Jonas, noting that he was "the only mental health practitioner who had the

opportunity to examine the entire medical evidentiary record." [T. 27]. The ALJ specifically assigned no weight to the opinion of Ms. Howell, noting that it was based primarily on Plaintiff's behavior, which was inconsistent with her presentations elsewhere, and because there was "apparent poor effort on testing." [Id.]. The ALJ further assigned no weight to the opinion of Dr. deBeus, finding that his opinions were internally inconsistent and also inconsistent with Dr. Jonas's opinions. [Id.]. He further attributed no weight to Dr. Marcus's opinion "in particular because Dr. Jonas's testimony contradicts her opinion." [Id.].

With respect to Plaintiff's physical limitations, the ALJ rejected Dr. McDowell's opinion, noting that his records were "remarkable for an absence of any diagnostic tests, and his diagnoses appear to be based almost exclusively on the claimant's reported symptoms." [Id.]. He further found that Dr. McDowell's opinion to be inconsistent with his own progress notes and with the record as a whole. [Id.]. Finally, the ALJ assigned no weight to the DDS consultants' opinions, because they failed to consider the level of pain from her fibromyalgia and the effect of her combined impairments. [Id.].

## VI. DISCUSSION

On appeal, Plaintiff argues that the ALJ erred in failing to include all of the limitations imposed by Plaintiff's personality disorder and her marked

impairment in social functioning in his RFC assessment. She further contends that the ALJ improperly evaluated the evidence presented by the treating and examining sources, and that he erred in assessing her credibility.

As discussed below, the Court agrees with the Plaintiff that the ALJ erred in his assessment of her RFC and in his evaluation of the treating and examining source evidence of record. Specifically, the Court finds that the ALJ failed to state any rational basis for his mental RFC assessment by rejecting all medical source evidence except that of Dr. Jonas. Dr. Jonas' opinion, however, was flawed in several respects, which rendered the ALJ's reliance upon such opinion unreasonable. Because it is unclear whether the ALJ's RFC findings regarding physical work functions came from an accepted medical source, the Court cannot say that the errors in the mental RFC evaluation were harmless. Accordingly, this matter must be remanded for correct application of the sequential evaluation.

When evaluating the medical opinion of a treating physician, the ALJ must determine whether that opinion should be given controlling weight. 20 C.F.R. § 404.1527(d). In order to be granted controlling weight, the opinion must be from a treating source; it must be a medical opinion concerning the nature and severity of the claimant's impairment; and it must be well-supported by medically acceptable clinical and laboratory diagnostic

techniques. 20 C.F.R.§ 404.1527(d); Social Security Ruling ("SSR") 96-2p. If an opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining the weight to be afforded to the opinion: 1) the examining relationship; 2) the length, nature, and extent of the treatment relationship; 3) the extent to which the evidence supports the opinion; 4) the opinion's consistency with the record as a whole; 5) the specialty of the medical source; and, 6) other relevant factors. 20 C.F.R. § 404.1527(d)(1)-(6).

The RFC is comprised of findings about Plaintiff's capacity to perform physical and mental work functions. SSR 96-8p. Evidence from some accepted medical source must be the basis of an ALJ's opinion on RFC; the ALJ "may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)).

Evidence regarding Plaintiff's mental RFC came from six sources: primary care physician Brian McDowell; consultative examiners Jerelene Howell, M.S., William Dycus, Ph.D. and Karen Marcus, Psy.D.; treating psychologist Roger deBeus, Ph.D.; DSS non-examining consultant Wilbur Albertson; and psychiatrist Alfred Jonas, M.D., the non-examining psychiatrist

who testified at the ALJ hearing.  Of these sources, the ALJ relied exclusively on the opinions of Dr. Jonas.  Dr. Jonas' testimony, however, does not provide substantial evidence to support the ALJ's mental RFC findings.  At the ALJ's direction, Dr. Jonas opined only as to the "B" Criteria (i.e. Listing 12.04 (B)(1) through (4)), and he did so after only a partial review of the evidence of record.  Further, because he testified only about the "B" Criteria, Dr. Jonas did not articulate a mental RFC opinion.  Testimony about the "B" Criteria, however, does not constitute substantial evidence of the specific limitations required for an RFC:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C.* . . .

SSR 96-8p at *4 (emphasis added).[3]  Lacking the required detailed assessment of functions, Dr. Jonas' opinion is insufficient to constitute

---

[3]The Court further notes that Dr. Jonas' testimony was given by telephone, a practice which, while not clearly prohibited, has been criticized for its diminution of the ALJ's opportunity to perform his duty to assess the credibility of witnesses.  See Ainsworth v. Astrue, No. 09-cv-286-SM, 2010 WL 2521432 at *3-4 (D.N.H. June 17, 2010).

substantial evidence to support the ALJ's mental RFC findings. Because the ALJ failed to articulate any other accepted medical basis for his mental RFC findings, the Court concludes that the ALJ's mental RFC findings have no rational basis in law and are not supported by substantial evidence.

An examination of the entire record reveals an additional error in the ALJ's evaluation of evidence regarding Plaintiff's physical RFC. As previously noted, evidence from some accepted medical source must be the basis for an ALJ's RFC finding. With regard to Plaintiff's physical RFC, there are three relevant sources of record: Gene Holmes, SDM (Single Decision Maker), DDS evaluator Melvin Clayton; and Dr. McDowell, Plaintiff's treating physician.

As an SDM with no medical credentials, Mr. Holmes' opinion cannot constitute substantial evidence upon which to base an RFC. See Jones v. Astrue, No. 1:09cv362, 2010 WL 4235752, at *1 (W.D.N.C. Oct. 1, 2010); Nicholson v. Astrue, No. 1:09cv362, 2010 WL 4506997, at *6 (W.D.N.C. Oct. 29, 2010). Thus, Mr. Holmes' opinion, regardless of its content, was entitled to no evidentiary weight.

As for Mr. Clayton, his credentials for offering an RFC opinion are not stated in the record. [T. 273]. As such, the Court cannot determine whether he is an accepted medical source whose opinion would constitute substantial evidence to support the ALJ's findings. The Agency's failure to provide a clear

indication that Mr. Clayton or anyone involved in the initial or reconsideration-level evaluation of Plaintiff's claim was an accepted medical source reduces confidence in that evaluation, and in turn, in the ALJ's decision that is based thereon.

The only treating source opinion before the ALJ on the issue of Plaintiff's physical RFC came from Dr. McDowell. The ALJ, however, rejected Dr. McDowell's opinion, noting that his records were "remarkable for an absence of any diagnostic tests, and his diagnoses appear to be based almost exclusively on the claimant's reported symptoms." [T. 27]. The record is replete, however, with diagnostic testing performed or ordered by Dr. McDowell. This finding, therefore, is not supported by substantial evidence. Additionally, the ALJ found Dr. McDowell's disability opinion to be "inconsistent with his own progress notes and with the longitudinal medical record." [Id.]. The ALJ failed to identify, however, a single inconsistency between Dr. McDowell's medical records and his opinions. For these reasons, the Court cannot conclude that the ALJ's rejection of this treating physician's opinion was supported by substantial evidence.

The Court finds these errors in the evaluation of medical source evidence to be so fundamental as to diminish confidence in the outcome of the proceeding. See Myles v. Astrue, 582 F.3d 672, 674 (7th Cir. 2009). As

Judge Howell stated in <u>Jones v. Astrue</u>, "[i]nasmuch as plaintiff has but one opportunity  to seek benefits for this period, . . . the possibility that a different result could be reached requires remand as mistaking the conclusion of [a] lay employee of the Commissioner for that of a physician is so fundamental as to undermine confidence in the process as well as the outcome if left uncorrected."  2010 WL 4235752, at *2.

In light of this decision, Plaintiff's other assignments of error need not be addressed, but she is free to raise them upon remand.


## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 7] is **GRANTED** to the extent that the Plaintiff seeks reversal of the Commissioner's decision denying her disability benefits. To any extent that the Plaintiff seeks an immediate award of benefits, the Plaintiff's Motion [Doc. 7] is **DENIED**.

Pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner under Sentence Four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this case is hereby **REMANDED** to the Commissioner for further administrative action consistent herewith.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Judgment on the Pleadings [Doc. 13] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: November 4, 2011

Martin Reidinger
United States District Judge